(No. 47386.—

NATIONAL LOCK COMPANY *et al.*, Appellants, v. THE INDUSTRIAL COMMISSION *et al.*—(Marie S. Moen, Appellee.)

*Opinion filed November 25, 1975.*

CREBS, J., took no part.

Rooks, Pitts, Fullagar and Poust, of Chicago (Douglas F. Stevenson and William M. Stevens, of counsel), for appellants.

Asher, Greenfield, Goodstein, Pavalon & Segall, Ltd., of Chicago (Peter B. Carey, Irving M. Greenfield and John C. O'Rourke, Jr., of counsel), for appellee.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

An arbitrator for the Industrial Commission found that the claimant, Marie S. Moen, had suffered permanent and complete loss of use of both hands and awarded her a pension for life under sections 8(e)(18) and 8(f) of the Workmen's Compensation Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.8). Additional evidence was received on the employer's petition for review, and the Industrial Commission affirmed the decision of the arbitrator. On *certiorari* the circuit court of Winnebago County confirmed the award, and the employer has appealed to this court under Rule 302.

It is undisputed that the injury arose out of and in the course of the claimant's employment. She was operating a plastic molding machine on September 20, 1971, and in order to load the die she put both hands into the machine up to her wrists. The machine "double tripped" and closed

on both hands. When she yelled for help, two men came and "they had to knock the machine off manually." The amputation of the left little finger and the right ring finger were surgically completed at once, and other fractures and partial amputations were surgically repaired. The bones in each finger were broken. She spent three weeks in the hospital, and thereafter received therapeutic treatments. She returned to work on December 20, 1971, but continued to visit the doctor until August of 1972.

When she first returned to work, she was assigned the duty of answering the telephone in the hospital area; if the pain in her hands became too great, she could lie down. In the spring of 1972 she was transferred to a filing job, but her hands were not strong enough to write and pull files. She was transferred first to the "estimating and planning" office and then to "production control," where she was working at the time of the hearing. Her duties involved going to the various departments in the shop and filing in numerical order envelopes that are about 9 inches by 16 inches. To do this work she must wear a rubber finger stall on each of her remaining fingers, because her "fingers are slick" and without stalls her hands would slip right off the files. She testified at the hearing before the arbitrator that "If I stay on the job any length of time, I have to quit and sit down or else go down to the hospital and have whirlpool treatments to loosen them up to relieve the pain." She is unable to perform ordinary household functions. "If I reach for a glass, I think I have a hold of it, and it either hits me in the face or it falls to the floor." To make a bed is next to impossible. She has pain in the wrists "like a toothache," and she receives pain medication from Dr. Halverson, one of the company doctors at the Lundholm Surgical Group, who examined her on February 12, 1973. With exception of one week, she had lost no time after she returned to work on December 20, 1971.

An examining physician, called by the employer, testified that there was marked restriction of motion of

the fingers of both hands and evidence of atrophy of the forearm muscles. In his opinion further treatment would not improve the motion of her hand. He testified that in his letter to the employer's insurance company he stated: "I do not frankly believe that she could do any type of factory work." He testified further that the muscles that control the fingers are atrophied and that "there is apparent loss to pin prick sensation in most of the skin surfaces of the four fingers on each hand." Medical testimony offered on behalf of the claimant included testimony that there had been "severe crushing of both hands, with multiple fractures involving the phalanges, metacarpal, and carpal bones of both hands and wrists, with marked limitations of function of both right and left hands and wrist joints. *** Because of severe neurotrophic changes of the skin of both hands and because the skin is very thin and very smooth, she cannot grasp things with her fingers."

The employer's argument that there was not 100% loss of both hands is predicated upon the testimony of one of its physicians that there was some usable function remaining in spite of the marked impairment to which he testified. The usable function, however, was not described. The resolution of conflicting medical testimony is primarily the responsibility of the Industrial Commission, and on this record, we are unable to say that the Commission erred in finding that the claimant had suffered permanent and complete loss of use of both hands. See *Pontiac Chair Co. v. Industrial Com.* (1974), 59 Ill.2d 261, 266; *Ford Motor Co. v. Industrial Com.* (1973), 55 Ill.2d 549, 554; *Floyd v. Industrial Com.* (1970), 47 Ill.2d 193, 196.

The respondent also argues that the circuit court erred, as a matter of law, in confirming the award of the Commission of a pension for life based upon permanent and complete loss of use of both hands suffered in one accident. This contention involves the construction of sections 8(e)(18) and 8(f) of the statute, which provide:

"[Section 8(e)] 18. *The specific case* of loss of both hands, both arms, or both feet, or both legs, or both eyes, or of any two thereof, suffered in one accident, or the permanent and complete loss of the use thereof, suffered in one accident, constitutes total and permanent disability, to be compensated according to the compensation fixed by paragraph (f) of this Section. These specific cases of total and permanent disability do not exclude other cases.

\* \* \*

(f) In case of complete disability, which renders the employee wholly and permanently incapable of work, compensation equal to 65% of his earnings but not less than \$31.50 nor more than \$59 per week, subject to and in accordance with the provisions of subparagraphs 2, 3 and 4 of paragraph (b) of this Section, commencing on the day after the accident, and continuing until the amount paid equals the amount which would have been payable as a death benefit under paragraph (a), Section 7, if the employee had died as a result of the accident at the time thereof, leaving heirs surviving as provided in said paragraph (a), Section 7, and thereafter a pension during life annually, *in the specific case of total and permanent disability equal to 15%* and in other cases of total and permanent disability equal to 12%, of the amount which would have been payable as a death benefit under paragraph (a), Section 7 \*\*\*.

\* \* \*

If any employee who receives *an award under this paragraph* afterwards returns to work or is able to do so, and earns or is able to earn as much as before the accident, payments under such award shall cease. If such employee returns to work, or is able to do so, and earns or is able to earn part but not as much as before the accident, such award shall be modified so as to conform to an award under paragraph (d) of this Section. \*\*\*

*Disability as enumerated in subdivision 18, paragraph (e) of this Section is considered complete disability.*" (Emphasis added.) Ill. Rev. Stat. 1971, ch. 48, par. 138.8.

These provisions were construed in *Scandroli Construction Co. v. Industrial Com.* (1973), 54 Ill.2d 395. There the employee, a carpenter, had fallen through a roof

onto a concrete floor 30 feet below and had suffered fractures of the heels and injuries to both feet. At the time of the hearing he was employed as a construction superintendent. The employer argued "that the Workmen's Compensation Act provides that an injury cannot be compensable for 100% loss unless it 'renders the employee wholly and permanently incapable of work.' " The court rejected this contention saying:

> "The plain language of section 8(f), which provides for a termination or reduction of compensation if the employee returns to work or is able to do so, is limited solely to awards for actual disability and does not apply to an award based on loss or complete loss of use of two members of the body pursuant to section 8(e)(18). This conclusion is apparent, for had the legislature intended that an employee demonstrate his inability to work in cases involving the loss or complete loss of use of two members of his body there would have been no need for the enactment of section 8(e)(18). This interpretation is further supported by that provision of section 8(f) which specifically provides that injuries incurred within the purview of section 8(e)(18) shall be · construed as complete disability." 54 Ill.2d at 399.

We see no reason to deviate from the construction of the statute which was adopted in *Scandroli*. We adhere to the view that to construe section 8(e)(18) otherwise would deprive that provision of meaning. Nor are we persuaded by the argument that the *Scandroli* result contravenes what the employer describes as the underlying purpose of the statute—"financial protection for workers whose earning power is interrupted, diminished or terminated." In our opinion the legislative purpose is broad enough to accommodate the pain and inconvenience that accompany the "specific case of loss of both hands, both arms, both

feet or both eyes in a single accident" even though the employee remains able to work.

The judgment of the circuit court of Winnebago County is affirmed.

*Judgment affirmed.*

MR. JUSTICE CREBS took no part in the consideration or decision of this case.